UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| MICHELLE McLAUGHLIN, | ) | Civil Action No.: 4:15-cv-0245-RBH-TER |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| -vs- | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| CSX TRANSPORTATION, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## I.    INTRODUCTION

Plaintiff brings this action pursuant to Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. § 2000(e) et seq., and 42 U.S.C. § 1981, alleging that Defendant harassed and discriminated against her because of her gender and retaliated against her for engaging in protected activity.[1]  Presently before the court is Defendant's Motion for Summary Judgment (Document # 35). All pretrial proceedings in this case were referred to the undersigned pursuant to the provisions of 28 U.S.C. § 636(b)(1)(A) and (B) and Local Rule 73.02(B)(2)(g), DSC.  This report and recommendation is entered for review by the district judge.

## II.    FACTS

Plaintiff started working for CSX Transportation (CSXT) as a clerk in Albany, New York in 1999. Pl. Dep. 12-13 (Ex. D to Pl. Resp.). In July of 2010, she was accepted into CSXT's Management Trainee Program as a trainee for CSXT's Maintenance of Way Department (MOW). MOW employees repair and maintain CSXT's railroad tracks. MOW employees travel frequently,

---

[1]Plaintiff also raised a state law claim for assault and battery in her complaint, but withdrew that claim in her Response.  Pl. Resp. 37.

and they work in difficult physical conditions exposed to the elements. It is crucial that MOW management employees are proficient in the technical aspects of railroad repair and maintenance because their work prevents serious accidents and even fatalities on the tracks. Mundy Decl. ¶ 3 (Ex. to Def. Motion). Plaintiff's 2010 performance review reflects that she had to retake a track safety test after she failed to meet the performance standard. She also turned in her track inspector checklist late. Her supervisor concluded that she would need to spend more time learning the technical components of being an assistant roadmaster. Mundy Dec. ¶ 4; Pl. Dep. 73, 74, Ex. 3. After Plaintiff completed the classroom portion of the training program, CSXT assigned her to the Florence Division. Mundy Decl. ¶ 5.

The Florence Division covers portions of Georgia, South Carolina, North Carolina, and Virginia and is headquartered in Florence, South Carolina. The Florence Division consists of multiple territories, and each territory has a Roadmaster (RM) who directs the work of various union employees to repair and maintain track in that area. As an MOW trainee, Plaintiff worked across territories with various RMs to learn the technical and management skills associated with railroad maintenance work. Mundy Dec. ¶ 5.

On April 1, 2011, Plaintiff completed the training program, and CSXT placed her in the Florence Division as an Assistant Roadmaster (ARM).[2] ARMs work with RMs to learn technical and management skills and to serve as acting RMs when needed. They travel throughout the division to learn the track. Mundy Dec. ¶ 6.

During her training in the MOW program and after her placement as an ARM, Plaintiff applied to numerous other positions within CSXT that involved less field work and less travel.

_____

[2] In November of 2012, CSXT changed the title of the ARM position to Road Master-In-Training (RMIT).

Jacobs Dec. ¶ 7 (Ex. to Def. Motion). On a number of occasions, she told a supervisor, Zach Nichols, that she would rather be a staff engineer than a RM. Nichols Dep. 32 (Ex. to Def. Motion). In August 2010, Plaintiff applied to be a staff engineer and an administrative assistant. A month later, she applied to be an operations supervisor. In January 2011, she applied to be a manager of construction operations, a manager at a call desk, a manager of engineering programs, and an engineer of a geometry car. In February 2011, she applied to be a manager of CSXT Maintenance, Overhaul, and Repair for Locomotives systems. Her applications continued in June 2011, when she applied to be a staff engineer. In 2012, she applied to be a freight claims specialist, a freight coordinator, a freight recovery specialist, a manager of passenger services, a manager of field administration, and a staff engineer. In 2014, she applied to be a manager of operations planning, a train dispatcher, an assistant plant superintendent, and an engineer of program construction. Jacobs Dec. ¶ 7. However, she also applied to numerous RM positions, several of which are discussed in detail below.

Plaintiff testified that upon her transfer into the Florence Division, John Turner, Assistant Division Engineer (ADE), and Chad Beverly, Roadmaster (RM), "made it clear to (the Plaintiff) that she wasn't wanted there." Pl. Dep. 179-181; 248; 249.[3]  Beverly told the Plaintiff that "she was forced down division's throat," that "she wasn't wanted there," and that "they didn't want to train her." Id.  Plaintiff testified that Beverly and Turner refused to train her and told the dispatchers to

---

[3]In addition to Beverly as RM, Plaintiff was supervised by the following managers during the following periods of time:
Division Engineer (DE) Bobby Moore - April 2011 - November 2012
ADE John Turner - April 2011 - December 2011
ADE Ron Elliott - December 2011 - November 2012
DE Ron Elliott - November 2012 - forward
ADE Mike Elandt - January 1, 2013 - March 2013
ADE Zack Nichols - March 2013 - May 2013
ADE Randy Parrish - November 2013 - January 2014

"make things hard" on her. Id.  In August of 2011, Plaintiff was deposed about racial discrimination that she had witnessed by Beverly and Turner and other white supervisors against the first two African American ARMs (Ernest McWhite and Darryl Brown) assigned to the Florence division. Pl. Dep. 180.

Ed Ragland, a Foreman on Extra Gang 6F04 at the time, testified that he heard Turner say "You better shut that bitch up. You better take care of that bitch. You better get her under control. I'm tired of this shit. She needs to go someplace else." Ragland Dep. 10-12; 18 (Ex. E to Pl. Resp.). Ragland knows that Turner was talking about the Plaintiff because he heard Turner say her name and knew that she "was the only female Assistant Road Master on the Florence Division." Ragland Dep. 12). Similarly, Ernest McWhite, who has been employed at CSXT since 2007 and is currently its Manager of Rail Trains, states that he has also personally heard, on numerous occasions from 2011 to the end of 2013, Beverly and Turner call the Plaintiff a "bitch" and say that they could not stand that "fucking bitch." McWhite Decl. ¶5 (Ex. A to Pl. Resp.).

Plaintiff testified that, although she asked all the time, Turner, Beverly, Moore and Elliott would never allow her to work out in the field with the labor teams, as the male ARMs/RMITs were allowed to do all the time. Rather, they only wanted the Plaintiff to test track and record her findings on the division computers - even going so far as to make her "re-qualify" on track on which she had previously qualified. Pl. Dep. 104-05. Moreover, even when the Plaintiff was testing track like Moore, Turner, Beverly and Elliott wanted her to do, they still got mad and yelled at her for not testing enough. Pl. Dep. 116-17. Plaintiff and McWhite testified that one of the reasons it was difficult for the Plaintiff to high rail/test as much as Moore, Turner, Beverly and Elliott wanted was the fact that she was not given her own high rail vehicle as were the male ARMs/RMITs.  Pl. Dep. 103-04; McWhite Decl. ¶ 4.  On one occasion in August/September of 2012, when the Plaintiff

-4-

asked Elliott and Moore why she didn't have her own high rail testing vehicle, Elliott told the

Plaintiff that "she had to earn the right to have a high rail vehicle." When Plaintiff then told Elliott

that the male ARMs/RMITs did not have to do so before they were given their high rail vehicles,

Elliott yelled back at her, "Well that's the way we are treating Michelle McLaughlin! Do you have

a problem with that? Well, do you?" Pl. Dep. 102-03,105-06.

　　　Elliott's recollection of the conversation is slightly different.  He does recall Plaintiff

complaining that the other ARMs/RMITs had high rail vehicles, but does not recall her mentioning

anything about gender.  Elliott Dep. 209 (Ex. to Def. Motion).  He testified that when Plaintiff first

asked for a high rail truck, she was not qualified to receive one nor was one available, but he told

her he would see about getting one for her.  Elliott Dep. 207-08; Elliott Decl. ¶ 3 (Ex. to Def.

Motion).  He testified that he probably said something along the lines of "this is how we are going

to do Michelle McLaughlin.  She has a truck right now.  We are going to deal with what we got."

Elliott Dep. 210. Once Plaintiff qualified and a high rail truck became available, she received it.

Jeffery Dep. 15 (Ex. to Def. Motion); Elliott Decl. ¶ 3.

　　　On another occasion, when the Plaintiff complained to Elliott about the bathrooms on the

track testing cars not working properly, he told her that she would have to get off the testing car to

use the bathroom, and make sure that the Sperry driver documented why they were having to get off

the tracks." Pl. Dep. 120-22.[4]

　　　Plaintiff and McWhite testified that during Plaintiff's employment on the Florence division,

it was normal procedure for the managers who were testing a section of track to have their personal

---

[4]Similarly, in April of 2011, shortly after her arrival on the Florence Division, Beverly, Turner, Brad Clayton (RM), Steven Love (RM), and several other managers told Plaintiff that if she had to go to the bathroom while testing track she would have to just "go in the woods, the swamp, or on the railroad tracks." Pl. Dep. 245.

vehicles brought from where they started testing in the morning to where they stopped testing at night. However, Plaintiff's personal vehicle was not brought to the stopping point. Pl. Dep. 122-23; McWhite Dep. ¶¶ 10, 11. On one occasion in 2013, Mike Elandt, one of the Plaintiff's supervisors at the time, kept the Plaintiff on a testing train for two days, when it was not testing track, and made her go onto another division where she was not supposed to go. Pl. Dep. 123-24. There was a male manager on this testing train with the Plaintiff on the last day they were testing on the Florence division and, at the end of this day, his personal vehicle was brought to him and he got off. Id. Plaintiff's personal vehicle was not brought out until two days later and, even then, it was taken to Savannah where she had to go pick it up herself. Pl. Dep. 123-26. Elandt stated that having her truck available at the end of the days work for her to pick up "was a luxury that she didn't need." Pl. Dep. 125-26. Male managers at CSX, including Elandt, on the other hand, were accorded this "luxury." Pl. Dep. 122-24.

During the summer and fall of 2012, one of the RMs to whom Plaintiff reported was Don Cottrell. Plaintiff felt, by Cottrell's demeanor and the way he acted toward her from the beginning, that he was "not happy" that the Plaintiff had been assigned to his subdivision. Pl. Dep. 98. Plaintiff testified that Cottrell wouldn't talk to her; he lied to her; on one occasion, he told the Plaintiff to get her high rail vehicle off the tracks when it was not required that she do so, and then, drove off and left her and all by herself in an area completely unknown to the Plaintiff; he was often rude to the Plaintiff; and made disparaging remarks about her to other managers. Pl. Dep. 99-100. Because of this treatment, Plaintiff complained to CSXT's Ethics Hotline about Cottrell. Pl. Dep. 100. Plaintiff did not think that the issue had been resolved properly as a result of her call to the Ethics Hotline, and so, she called Elliott, her DE, and told him what Cottrell had done. Elliott told the Plaintiff that he would talk to Cottrell. The next day, Plaintiff was told to report to the division office where she

sat in an empty office by herself for seven hours. While there, she went to the Elliott's office to ask why she was there and what work she could be doing while she was there; however, Elliott was not in the division office. Thus, the Plaintiff went to the Staff Engineer, John Henry Thomas, and asked "why she was there," "how long she had to stay," and "what was going on." Thomas laughed; said he didn't know; and told Plaintiff that she would have to ask the DE. Plaintiff then tried to call Elliott but got no answer. Pl. Dep. 100-01.

Elandt was Plaintiff's ADE from January to March of 2013. Plaintiff testified that Elandt told her early on that Elliott and other managers had told him: (1) that they had heard that she was nothing but trouble; (2) that she didn't know how to keep things in house; (3) that she was trying to cause problems for the division; and (4) that everyone knew about the Plaintiff and nobody wanted to work with her. Pl. Dep. 113-14. Elandt then proceeded to tell her that she got "all the shit jobs" because she was an ARM and alleged that she had improperly gotten onto the division's computer and changed her proper job designation, which Plaintiff told him was untrue. Pl. Dep. 112-13.

Plaintiff testified that Elandt treated the Plaintiff far worse than he treated the male ARMs/ RMITs (Ex. D, p.118:13-119:1). He would not talk to the Plaintiff and would not give her the same "good" work assignments that he gave the male ARMs/RMITs. Pl. Dep. 118-19. He attempted to discipline the Plaintiff for something she did not do in her 2013 Mid-Year Review. Elandt put the Plaintiff on performance probation because of some switch problems at the Hamlet yard. Pl. Dep. 128-29. Plaintiff discovered Elandt's discipline by accident in February of 2014, while talking to HR Representative Michelle Ross about getting her 2013 End of Year bonus. Pl. Dep. 130. Ross told Plaintiff that she couldn't get her End of Year bonus because she had been placed on performance probation by Elandt for switch problems at the Hamlet yard. Pl. Dep. 130. In March of 2013, Plaintiff first became aware of the switch problems and told Zach Nichols, her ADE at the time, who

-7-

told her not to worry about it because the RM was aware of the problems and everything was "ok." Pl. Dep. 128-29.  Plaintiff told Ross about her prior conversation with Nichols in March of 2013 regarding the defective switch panels in the Hamlet Yard.  Ross told the Plaintiff that she didn't know why proper procedures were not followed by CSXT regarding her alleged performance problem–that things must have "fallen through the cracks." Pl. Dep. 130-31.  Plaintiff testified that she was never counseled by Elandt or otherwise told of her performance probation or of other issues noted on the evaluation, including missing calls.  Pl. Dep. 128-29; 143-44.  She testified that, although there are written comments on the evaluation that are purportedly hers, she did not make the comments, and the evaluation was signed by Elandt three or four months after he stopped being her supervisor.  Pl. Dep. 128-29.[5]

During her employment with CSXT, Plaintiff called the Ethics Hotline on more than one occasion, including the time discussed above regarding the treatment received by Cottrell.  Pl. Dep. 100.  She also called the Ethics Hotline in the summer of 2012 regarding the comments of Ron Elliott about her not being allowed to have her own high rail vehicle like the male ARMs/RMITs and Elliott's response that this was "what we are doing for Michelle McLaughlin. Do you have a problem with that? Well, do you?"  She called regarding another comment by Elliott, in which he told her to "go do computer work because that's all you want to do anyway."

Plaintiff also had ethics complaints filed against her.  In October of 2012, Michael Cline, an engineer (union employee), filed an ethics complaint against Plaintiff. Mundy Dep. 28–29 (Ex. to Def. Motion). He alleged that he was in the female restroom because the male restroom was full, and

_____

[5]During this same conversation with Ross, Plaintiff questioned why Elandt had done her 2013 End of the Year Review when he was no longer her supervisor, and had not been since March of 2013.  Ross did not have an answer.  Pl. Dep. 131.

when he came out, Plaintiff yelled at him in front of other employees. Mundy Dep. 35–36. Robert Lusk also filed an ethics charge against Plaintiff. He contended that she called him a "dirty SOB." Mundy Dep. Ex. 4. In March 2013, Mark Wyndham, a CSXT Track Foreman Flagging Assistant, complained that Plaintiff gave him unfair write ups and made job threats against him. Mundy Dep. Ex. 5. An investigation determined that Wyndham had done nothing wrong. Mundy Dep. 62.

Plaintiff also called the Ethics Hotline about an incident with Ken Bass on May 9, 2013, while she worked in the Hamlet yard. Pl. Dep. 134-35; 136-37. Plaintiff testified that she did not particularly want to be assigned to the Hamlet yard because "it was known to have major discipline issues that weren't being corrected," and she did not need to be assigned there because she had already received the same training elsewhere. Pl. Dep. 151-52. The parties dispute the actual turn of events on May 9, 2013. Plaintiff testified that she held her normal morning briefing at the Hamlet yard and then made a comment about union employees coming in late to the meeting. Pl. Dep. 154-55. Plaintiff stated she was not talking about any particular employee when she said this, but Ken Bass, a union employee, "suddenly went nuts," yelling and saying that the Plaintiff "was no one, that they didn't have to listen to her, that he would take the Plaintiff on, and that she was not a manager." Pl. Dep. 154-55. While Bass was yelling these things, he was circling Plaintiff[6], who repeatedly told him to "stop doing what he was doing or he would get in trouble." Pl. Dep. 156-57.

During this episode, RM Woolard was on his cell phone talking to his wife but stepped in and told Bass to go to his truck when Bass drew back his fist like he was going to hit Plaintiff. Pl. Dep. 159-60. When Woolard spoke to Plaintiff about the incident approximately an hour later, Plaintiff felt he was much more concerned about Bass being upset than about what happened to

---

[6]"He was all around me. He walked beside me. He walked in front of me. He walked kind of behind me." Pl. Dep. 156.

Plaintiff and how she felt.  Pl. Dep. 161-62.

Woolard testified that Bass had told him on the morning of May 9, 2013, that he had forgotten his cell phone, and he gave Bass permission to retrieve it.  Woolard Dep. 26 (Ex. to Def. Motion).  Bass returned late to the morning briefing.  Woolard and Nichols testified that Plaintiff was angry that Bass had not notified her that he would be late, and she told him he was being removed from service for that day. Nichols Dep. 51; Woolard Dep. 38. At that point, Plaintiff and Bass got into a shouting match. Nichols Dep. 47. Woolard intervened in the dispute to separate the two. Pl. Dep. 160–61.  Bass did not touch Plaintiff with his hands, but he may have brushed against her as he walked past her. Pl. Dep. 159.  Woolard testified that Bass made no threatening moves toward Plaintiff. Woolard Dep. 55.

On the night of this incident, Plaintiff was told by Woolard and Nichols that she "had to drive with Woolard in his truck to Monroe" to meet with Nichols. Pl. Dep. 167-68. When the Plaintiff arrived in Monroe, she saw Nichols already talking to Bass.  Pl. Dep. 168. When Plaintiff was able to talk with Nichols she told him she wanted Bass removed from service, and he told her that "while he agreed with her actions that day and the discipline she wanted to give" to Bass, Elliott had decided "not to take Bass out of service"[7] and that because of this fact "his (Nichols) hands were tied," there was "nothing he could do about it," and that she could only give Bass a "5 day overhead assessment," which the Plaintiff felt was "not a real discipline" at all. Pl. Dep. 169-70.[8] During the

---

[7]Nichols testified that he told Plaintiff she could not remove someone from service just because they had an argument.  Nichols Dep. 48.

[8]Nichols later told the Plaintiff that Elliott "didn't want to talk to her," that he didn't want Bass "taken out of service," and that he just wanted Nichols "to make it all go away." Pl. Dep. 163.  Plaintiff and McWhite testified that other managers had the power to take people out of service.  Pl. Dep. 172-74; McWhite Decl. ¶ 8,

meeting in Monroe, the Plaintiff and Bass apologized to each and accepted the others apology - although Plaintiff testified that she did so only because she felt she had no choice but to do so and did not think she could do anything else about Bass' actions anyway.  Pl. Dep. 171-72.  After that, Bass received coaching and counseling due to unprofessional behavior. Nichols Dep. 55, 62. Plaintiff decided not to give an assessment to Bass because she thought  that she would be retaliated against by Bass and the union and management employees on the Florence division if she elected to do so.  Pl. Dep. 170-75.

As a result of the incident with Bass, the Plaintiff was so shaken that she had to take several days off from work. Pl. Dep. 175. When she returned to work at Hamlet on May 16, 2013, one of the first employees she saw was Ken Bass, who laughed at her, which Plaintiff felt was an indication of how little he respected her.  Pl. Dep. 176.  Plaintiff only worked until 3:00 P.M. on that day because she had a panic attack with severe chest pain.  Pl. Dep. 176-78.

On May 20th or 21st, Plaintiff was allowed to work in Charlotte because she did not want to work with Bass.  Pl. Dep. 177-78; Nichols Dep. 121-22.  While there, she talked with Nichols, who informed her that he could not do anything about Bass or Woolard because Woolard had a "close personal relationship with Ricky Johnson," the Chief Engineer, North.  Pl. Dep. 177.

In May 2013, Plaintiff started to receive counseling from JLB Counseling Agency because she was having regular panic attacks, was unable to focus, was sleeping poorly, and had lost her appetite. Pl. Medical Records, MAZGAJ-000001 (Ex. to Def. Motion). Her doctor noted that she had been having these symptoms for two-and-a-half years—since before she moved to Florence. Her doctor also noted that her anxiety had increased because her daughter was coming to live with her fulltime in Florence. Pl. Medical Records, MAZGAJ-000019. Her daughter moved to Florence in August of 2013. Pl. Dep. 184. At that point, she told her doctor that she wanted to remain in the

Florence area for her daughter. Pl. Medical Records, MAZGAJ-000004.

After working in Charlotte for the day, Plaintiff was approved for short-term disability, which ultimately extended from mid-May 2013 until November 1, 2013. Ross Dec. ¶ 3 (Ex. to Def. Motion); Pl.'s Dep. 192–93. In October 2013, Plaintiff was released to return to work by her doctor, Ross Dec. ¶ 4, but her doctor recommended that she work in the Florence area until she felt comfortable working elsewhere. Pl.'s Dep. 184, 193–94, Ex. 15.

On November 4, 2013, Plaintiff began working in Fayetteville[9] and continued working until December 5, 2013. Pl. Dep. 197-99. At this same time, HR told the Plaintiff that she had unused vacation time which she could not use while on sick leave, but that she had to use it before the end of the year or lose it. Pl. Dep. 199. Shortly before being told she had to use or lose her vacation time, Plaintiff was given a very important project working with a large system track surfacing and rail team in Lumberton, NC. Pl. Dep. 200. This was the type of project that the Plaintiff had always hoped she would be assigned and was very excited about it being assigned to her. Pl. Dep. 200-01. As a result, she felt she needed to work through the month of December to prepare for the project, and asked DE Elliott that she not be forced to use (or lose) her vacation time in December of 2013. Pl. Dep. 201-02. Elliott refused Plaintiff's request. Pl. Dep. 201. Plaintiff had also received an email telling her that she was going to have to attend a training session in Atlanta with Elandt, Nichols, Dave Poston, and Jamie Moore, which made Plaintiff feel uncomfortable because these individuals had treated her poorly. Pl. Dep. 200, 202. As a result, Plaintiff decided to use the rest of her vacation time through the end of 2013. Pl. Dep. 200. Plaintiff felt that she was being

---

[9]Plaintiff represents in her response that she began working in Fayetteville, but the cited portion of her deposition indicates only that she was assigned to Mr. Parrish, who was Engineer of Track for the territory running from Dillon to Richmond. Pl. Dep. 198.

discriminated against by not being allowed to work during the month of December without losing her vacation time. Pl. Dep. 200. However, she testified that she could have worked if she wanted to and other managers had lost vacation time in the past by not using it and working instead. Pl. Dep. 201-02.

Plaintuff went out on short-term disability once again on January 2, 2014. Ross Dec. ¶ 5. On January 15, she told her doctor that she would not be returning to her old job at CSXT. Pl. Medical Records, MAZGAJ-000037. Her doctor encouraged her to be more proactive looking for work. Pl. Medical Records, MAZGAJ-000040.

In February 2014, MetLife denied Plaintiff's application for continuing disability benefits. Ross Dec. ¶ 6. In March 2014, her doctor recommended that she be assigned to an office position due to mental health issues. Ross Decl. ¶ 7. She began working with a CSXT rehabilitation specialist, Fred Crane, but he was limited in the options he could provide because her doctor limited her to working in a stationary office environment and she did not want to move from Florence. Ross Decl. 7; Pl. Dep. 40. There were no open office positions in Florence for which she was qualified. Ross Dec. ¶ 7; Pl. Dep. 40. Had she been willing to work outside of Florence, Plaintiff could have returned to work as a clerk in Selkirk, New York by exercising her seniority rights under her collective-bargaining agreement. Ross Dec. ¶ 10.

In an effort to help Plaintiff find a position that fit within her limitations, CSXT paid for her to take a paralegal course at Seltzer College, but she never completed the course, and she never applied for paralegal positions. Pl. Dep. 27–28.

In August 2014, Plaintiff's doctor noted that Plaintiff was reluctant to apply for work due to her concern about how it would "interfere with receiving money from CSX." Pl. Medical Records, MAZGAJ-000050. In March 2015, her doctor noted that Plaintiff indicated that she was filing a

lawsuit. Pl. Medical Records, MAZGAJ-000057. She wanted "validation and maybe compensation." Id.

In December 2015, CSXT terminated Plaintiff's employment for two reasons: (1) she had been on leave for nearly two years and had not taken the steps necessary to return to work; and (2) in the course of discovery in this matter, CSXT became aware that Plaintiff had secretly recorded her conversations with CSXT managers, at least one of whom was in Florida where it is illegal to record without the consent of both parties. Ross Dec. ¶ 8; Ross Dep. 78; Pl.'s Dep. 16, 18.

On July 31, 2013, Plaintiff filed a Charge of Discrimination with the EEOC alleging discrimination based on race[10] and sex, as well as retaliation. Pl. Dep. Ex. 1. She received a right to sue letter from the EEOC on October 23, 2014. She filed the present lawsuit on January 16, 2015.

## III.    STANDARD OF REVIEW

Under Fed.R.Civ.P. 56, the moving party bears the burden of showing that summary judgment is proper. Summary judgment is proper if there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Summary judgment is proper if the non-moving party fails to establish an essential element of any cause of action upon which the non-moving party has the burden of proof. Id. Once the moving party has brought into question whether there is a genuine dispute for trial on a material element of the non-moving party's claims, the non-moving party bears the burden of coming forward with specific facts which show a genuine dispute for trial. Fed.R.Civ.P. 56(e); Matsushita Electrical Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574 (1986). The non-moving party must come forward with enough evidence, beyond a mere scintilla,

---

[10]Plaintiff's complaint in this Court does not raise a race-discrimination claim, and she testified that she is not asserting a race-discrimination claim. Pl. Dep. 61.

upon which the fact finder could reasonably find for it.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).  The facts and inferences to be drawn therefrom must be viewed in the light most favorable to the non-moving party.  Shealy v. Winston, 929 F.2d 1009, 1011 (4th Cir. 1991).  However, the non-moving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment.  Barber v. Hosp. Corp. of Am., 977 F.2d 874-75 (4th Cir. 1992).  The evidence relied on must meet "the substantive evidentiary standard of proof that would apply at a trial on the merits."  Mitchell v. Data General Corp., 12 F.3d 1310, 1316 (4th Cir. 1993).

To show that a genuine dispute of material fact exists, a party may not rest upon the mere allegations or denials of his pleadings.  See Celotex, 477 U.S. at 324.  Rather, the party must present evidence supporting his or her position by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."  Fed.R.Civ.P. 56(c)(1)(A); see also Cray Communications, Inc. v. Novatel Computer Systems, Inc., 33 F.3d 390 (4th Cir. 1994); Orsi v. Kickwood, 999 F.2d 86 (4th Cir. 1993); Local Rules 7.04, 7.05, D.S.C.

## IV.    DISCUSSION[11]

### A.    Scope of Plaintiff's Claims

"In order to pursue [any] Title VII claim, a plaintiff must first file an administrative charge

---

[11]The standards applicable to lawsuits under § 1981 are the same as the standards applicable to lawsuits under Title VII, with the same caselaw being used to evaluate a claim under either statute. See Bryant v. Aiken Reg'l Med. Ctrs., Inc., 333 F.3d 536, 545 n.3 (4th Cir. 2003); Mallory v. Booth Refrigeration Supply Co., Inc., 882 F.2d 908, 910 (4th Cir. 1989); Denny v. Elizabeth Arden Salons, Inc., 456 F.3d 427 (4th Cir. 2006).

with the EEOC." Gilliam v. S. Carolina Dep't Of Juvenile Justice, 474 F.3d 134, 139 (4th Cir.2007) (citing 42 U.S.C. § 2000e–5(e)). Any subsequent complaint that the plaintiff files in federal court must be based on acts of discrimination that occurred within the applicable limitations period. Id. When, as here, the alleged violation is proscribed by state law and the plaintiff has also filed her charge with the appropriate state agency, that limitations period is 300 days preceding the filing of the EEOC charge. White v. BFI Waste Servs., LLC, 375 F.3d 288, 292 (4th Cir.2004). Plaintiff filed her Charge of Discrimination on July 31, 2013. Thus, 300 days prior to that date is October 5, 2012. Further, Plaintiff asserted, under penalty of perjury, in her Charge of Discrimination, that the date of earliest discrimination was October 5, 2012. Accordingly, Plaintiff is limited in this lawsuit to claims based on events occurring on or after October 5, 2012. See Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 962-63 (4th Cir. 1996)("The allegations contained in the administrative charge of discrimination generally operate to limit the scope of any subsequent judicial complaint."). Therefore, any alleged discriminatory or retaliatory acts that occurred before October 5, 2012, including any allegations of failure to train or promote Plaintiff, are not actionable.

Under the continuing violation doctrine, however, "a Title VII plaintiff seeking to recover for a hostile work environment can recover for acts occurring even beyond that period, as long as at least a portion of the hostile work environment occurred within the relevant limitations period." White, 375 F.3d at 292-93 (citing Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 122, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002)).

Futhermore, even though events occurring more than 300 days before the filing of an EEOC charge cannot be independently actionable in a Title VII case, such statements may nevertheless be considered as evidence demonstrating the context in which the Plaintiff's timely claims arose, and be used to meet plaintiff's burden of proof under the McDonnell Douglas framework to show an

intent to discriminate and/or to be used to prove pretext. See, e.g., Young v. Nat. Center for Health Services Research, 828 F. 2d 235, 238 (4th Cir. 1997) (citing Downey v. Southern Natural Gas Co., 649 F.2d 302, 305 (5th Cir.1981) ("If the employee has related discrimination claims that are barred by limitations or failure to exhaust, 'these actions should be allowed as evidence on the question of whether [plaintiff] was constructively discharged.'"); Williams v. Giant Food, Inc., 370 F.3d 423, 430, fn 3 (4th Cir. 2004) (approving plaintiff's use of evidence outside the statute of limitations period to demonstrate background relevant to proving her claims of individual discrimination within the McDonnell Douglas framework).

**B.     Discrimination**

Plaintiff alleges that Defendant discriminated against her because of her sex with respect to numerous failures to promote and denials of training and other job support. Title VII makes it "an unlawful employment practice for an employer-(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin...." 42 U.S.C. § 2000e–2(a)(1). Plaintiffs have two avenues of proof by which they may attempt to establish their claims–the direct evidence standard, or the burden-shifting scheme. Plaintiff argues that genuine disputes of fact exist under either avenue of proof.

**1.     Direct Evidence**

Direct evidence of discrimination is "evidence of conduct or statements that both reflect directly on the alleged discriminatory attitude and that bear directly on the contested employment decision." Cassity v. Geren, 749 F.Supp.2d 380, 402 (D.S.C. 2010) (citing Taylor v. Va. Union Univ., 193 F.3d 219, 232 (4th Cir.1999) (en banc), abrogated on other grounds, Desert Palace, Inc. v. Costa, 539 U.S. 90, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003)). To evaluate whether a "nexus"

exists between discriminatory statements and an adverse employment action, "[c]ourts have considered the context of the statement, its temporal proximity to the adverse employment action, and the status of the person making the statement." E.E.O.C. v. CTI Global Solutions, Inc., 815 F. Supp. 2d 897, 906 (D. Md. 2011). An adverse employment action in the discrimination context is one that adversely effects the terms, conditions, or benefits of the plaintiff's employment. James v. Booz–Allen & Hamilton, Inc., 368 F.3d 371, 375–76 (4th Cir.2004).

Because Plaintiff alleges numerous discriminatory employment actions, for each act, she must show conduct or statements that directly reflect a discriminatory attitude and that bear directly on the adverse employment decision. In her response, Plaintiff provides a list of instances she argues are direct evidence of sex discrimination:

(1) Bobby Moore, her DE from April of 2011, to November of 2012, would not let her work in the field with work teams like he allowed the male ARMs/RMITs do and continuously yelled at her for not "high railing enough."

(2) Ron Elliott, her ADE from December of 2011 to the end of November 2012 and DE from December of 2012 through December of 2013, told Plaintiff that she had to "earn the right to have her own high rail vehicle" and when the Plaintiff pointed out that male ARMs/RMITs did not have to do so, he yelled back at the Plaintiff; "Well that is the way we are doing Michelle McLaughlin! Do you have a problem with that? Well do you?" He also would not talk to Plaintiff until over an hour after the Bass incident in Hamlet; was more concerned with how Bass felt after the Hamlet incident than how the Plaintiff felt; would not let Plaintiff take Bass out of service even though other RMs had been allowed to do so in the past. When Plaintiff complained to Elliott about the bathrooms on the track testing cars not working properly, he told her that she would just have "to hold it" for as long as it took and that if she did get off the GMRS car to use the bathroom, she had better make

sure that the Sperry driver "documented exactly why they were getting off the tracks and how long it took for her to do her business."

(3) John Turner, Plaintiff's ADE from April of 2011 to December of 2011, said in front of Ed Ragland in August/September of 2011, "You better shut that bitch up. You better take care of that bitch. You better get her under control. I'm tired of this shit. She needs to go someplace else;" on numerous occasions in front of Ernest McWhite called the Plaintiff a "bitch," said he "couldn't stand that bitch'" and asked "where is that bitch now;" and told the Plaintiff that if she had to go to the bathroom while she was testing track, " she would just have to go "in the woods, swamp, or on the tracks."

(4)  Mike Elandt, Plaintiff's ADE from January 1, 2013 until March of 2013, told her that she got all the "shit jobs;" disciplined Plaintiff on her 2013 Mid-Year Review for something she was told was ok; told Plaintiff that having her personal vehicle brought to her at the end of the day after testing track was a "luxury" that "she didn't need;" and always required the plaintiff to stake curves, an extremely undesirable job.

(5)  Zack Nichols, Plaintiff's ADE from March of 2013 to December 31, 2013, didn't back the Plaintiff up when she wanted to take Bass out of service because he was afraid of Elliott and knew that Tommy Woolard, who was a "close personal friend of Chief Engineer (North) Ricky Johnson, was  Bass' good friend.

(6) Chad Beverly, Plaintiff's RM, said when Plaintiff first started in April of 2011 that the Plaintiff was "forced down the division's throat, that she "wasn't wanted there," that she "needed to find someplace else to go," and that they "didn't want to train her;" told the dispatchers to "make things hard" on the Plaintiff; and demeaned the Plaintiff and said derogatory things about her to other managers.

-19-

(7) Don Cottrell, another RM Plaintiff worked during the summer and fall of 2012, after inspecting track with the Plaintiff in territory unfamiliar to the her, he told Plaintiff that she had to take her test car off the tracks (when she really didn't really have to do so), and then went off and left her all by herself in an area with which she was completely unfamiliar.  When the Plaintiff complained to Ron Elliott about her treatment by Cottrell, she was told by Elliott to go to the Florence division office the next day, where she had to sit in an empty office all by herself for 7 straight hours.

(8) Finally, Plaintiff argues that the incident with Ken Bass occurred because of the discipline problems at the Hamlet yard, which were caused by RM Tommy Woolard's lack of managerial skills, his friendship with Bass, and his " much too close" personal relationship with Ricky Johnson (Chief Engineer -North).

First, some of these actions listed by Plaintiff clearly occurred outside the limitations period, including the comments by Turner and Beverly, which were made in 2011, and the issue with Elliott not giving her a high rail vehicle, which occurred in August or September of 2012. Pl. Dep. 104-05, 179-81.  Others, such as Bobby Moore not letting her work in the field with work teams like he allowed the male ARMs/RMITs do and continuously yelling at her, and Don Cottrell making her take her car off the track and leaving her in an unfamiliar place, may fall outside the limitations period, as Plaintiff has not given specific dates for these events.  Nevertheless, none of the evidence cited by Plaintiff amounts to direct evidence of sex discrimination.

None of the comments or conduct to which Plaintiff points proves the existence of discrimination "without inference or presumption," Carter v. City of Miami, 870 F.2d 578, 581–82 (11th Cir. 1989), nor do they have a nexus with an adverse employment action. CTI Global Solutions, 815 F. Supp. 2d at 906.  Neither unappealing job assignments, yelling, refusing to speak

to Plaintiff, false statements about Plaintiff, reprimands, or criticism amount to adverse employment actions.  See Booz–Allen, 368 F.3d at 375–76 (a job assignment, "even if less appealing to the employee," does not constitute an adverse employment action); Mackall v. Colvin, 2015 WL 412992, *18-19 (D.Md. Jan. 29, 2015) (loss of bonus not an adverse employment action); Zuzul v. McDonald, 98 F.Supp.3d 852, 867-68 (M.D.N.C. 2015) (collecting cases of other actions not constituting adverse employment actions).  Accordingly, Plaintiff has failed to present sufficient direct evidence to create a genuine dispute of fact of sex discrimination.

### 2.    Burden-Shifting Scheme

Even in the absence of direct evidence of discrimination, Plaintiff may prove her claims using the burden-shifting method of proof set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).  Under this burden-shifting scheme, Plaintiff has the initial burden of establishing a prima facie case of discrimination.  Id.  The elements to establish prima facie cases of discriminatory failure to promote and failure to provide training and job support are slightly different and are discussed in more detail below.

If Plaintiff establishes a prima facie case, the burden shifts to Defendant to produce a legitimate, nondiscriminatory reason for the disparate treatment.  Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 254 (1981).  This is merely a burden of production, not of persuasion.  St. Mary's Honor Center v. Hicks, 509 U.S. 502, 506 (1993).

Once Defendant has met its burden of production by producing its legitimate, nondiscriminatory reason, the sole remaining issue is "discrimination vel non."  Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 143 (2000)(citing Postal Service Bd. of Governors v. Aikens, 460 U.S. 711, 716 (1983)).  In other words, the burden shifts back to Plaintiff to demonstrate by a preponderance of the evidence that the legitimate reason produced by Defendant is not its true

reasons, but was pretext for discrimination. <u>Reeves</u>, 530 U.S. at 143. Throughout the burden shifting scheme set forth in <u>McDonnell Douglas</u>, the ultimate burden of proving that Defendant intentionally discriminated against Plaintiff remains at all times with Plaintiff. Plaintiff has the ultimate burden of presenting evidence from which a reasonable jury could conclude defendant intentionally discriminated against her.

### a.    Failure to Promote

Plaintiff argues that CSXT discriminated against her because of her sex with respect to eight different promotions.[12] However, four of those promotions occurred prior to October 5, 2012, and, thus, fall outside the limitations period. <u>See</u> Pl. Resp. 12-13.[13] For the remaining promotions at issue, to state a prima facie case, Plaintiff must show that she (1) is a member of a protected class, (2) who applied for the position, (3) was qualified for the position, and (4) was rejected under circumstances giving rise to an inference of discrimination. <u>Anderson v. Westinghouse Savannah River Co.</u>, 406 F.3d 248, 268 (4th Cir. 2005).

Defendant argues that Plaintiff cannot establish a prima facie case with respect to two of the positions she identified because she was out on medical leave at the time these promotions were made and, even when she returned to work, she returned with a recommendation from her doctor that she be limited to working in the Florence area, and, thus was not qualified for the positions.

---

[12]She originally identified fifteen promotions, <u>see</u> Elliott Dep. Ex. 4, but narrowed them to eight in her Response. Pl. Resp. 12-15.

[13]Even though these failures to promote are not actionable, as discussed above, they can be used as evidence that the promotions that are at issue were made with some discriminatory animus toward Plaintiff. However, Plaintiff fails to present sufficient evidence to show that these promotion decisions were made with any discriminatory animus toward Plaintiff. Even though McWhite himself felt that Plaintiff was as qualified as he was for the RM position he received in April of 2011, McWhite Decl. ¶ 9, the decisionmaker in that promotion, Bobby Moore, was different from the decisionmaker in the promotions at issue, Ron Elliott. Elliott Dep. 68.

Plaintiff began her first medical leave of absence in mid-May of 2013 until November 1, 2013. Ross Dec. ¶ 3; Pl.'s Dep. 192–93. Plaintiff was released to return to work by her doctor on November 1, 2013, Ross Dec. ¶ 4, but her doctor recommended that she work in the Florence area until she felt comfortable working elsewhere. Pl.'s Dep. 184, 193–94, Ex. 15.  The first position at issue during the time frame is an August 2013 opening for an RM in Cayce, South Carolina, which was awarded to Walter Brazell.  Pl. Dep. 242; Jacobs Dep. 163.  Plaintiff was on medical leave at the time Brazell was placed in that position.  Jacobs Dep. 163.  Jenna Jacobs, one of CSXT's Rule 30(b)(6) designees, testified that employees on medical leave are not considered for direct placement[14] positions.  Jacobs Dep. 163.  If Plaintiff was not working due to medical reasons, it follows that she would not have been qualified for that position at that time.  See Wilson v. Amtrak Nat'l R.R. Corp., 824 F. Supp. 55, 59 (D. Md. 1992) (holding that where a plaintiff was absent from work for medical reasons, he must demonstrate that he was medically able to return to work to be qualified for the position).  Therefore, Plaintiff fails to establish a prima facie case of discrimination with respect to this promotion.  See id.

The other position Defendant argues Plaintiff was not qualified for due to medical reasons is an RM position in Roanoke Rapids, North Carolina, which was awarded to Jonathan Turner.  Pl. Dep. 233; Jacobs Dep. 130.  Plaintiff testified that the position was filled in February of 2013, while Jacobs testified that the position was filed in November of 2013.  Pl. Dep. 233; Jacobs Dep. 130.  Viewing the evidence in the light most favorable to Plaintiff, the position was filled in February of 2013, Plaintiff was not on medical leave at the time, and, thus, she was not unqualified for the position due to medical reasons.  Even if the position was filled in November of 2013, as

---

[14]Direct placement did not involve an application or interview process.  Jacobs Dep. 27.

Defendant's witness testified, Plaintiff would not have been unqualified for medical reasons as she had returned to work from medical leave by that time. Defendant argues that she was not qualified because her doctor recommended that she stay in the Florence area, and Plaintiff never sought to have the "restriction" lifted. However, despite this recommendation, Plaintiff began working in Fayetteville, NC on November 4, 2013, and continued working there until December 5, 2013, when she was told she would have to use or lose her vacation time. Pl. Dep. 197-99. Thus, neither Plaintiff nor CSXT followed the recommendation that Plaintiff stay in the Florence area. Therefore, Defendant's argument that Plaintiff was not qualified for a position outside of Florence according to her doctor's recommendation, is without merit where Defendant did not follow this recommendation at the time and placed Plaintiff in a position outside of Florence upon her return from medical leave.

Aside from the argument that Plaintiff was unqualified for medical reasons[15], Defendant does not argue that Plaintiff cannot establish a prima facie case on her failure to promote claims. The remaining positions at issue about which Plaintiff argues she was denied because of her sex are a November/December 2012 opening for an RM in Dillon, South Carolina, which was awarded to Craige English, a February 2013 opening for an RM in Florence, South Carolina, which was awarded to Jonathan Thomas, and the February (or November) 2013 opening for an RM in Roanoke Rapids, North Carolina, which was awarded to Jonathan Turner. Pl. Dep. 224-33; Jacobs Dep. 117-18, 126, 128-29, 135. The burden shifts to Defendant to produce legitimate, nondiscriminatory reasons for selecting other candidates over Plaintiff. Defendant argues that in each instance, it selected a candidate who was more qualified.

---

[15]And other arguments raised by Defendant for promotion denials Plaintiff is no longer pursuing.

-24-

Elliott, Jacobs, and Randy Parrish participated in Plaintiff's interview for the RM position in Dillon, South Carolina in December of 2012. Pl. Dep. 228-29. Both Elliott and Jacobs testified that Plaintiff demonstrated a lack of technical knowledge in December 2012 when she interviewed for the RM position in Dillon, South Carolina. At that interview, she provided at least one technical answer that was not consistent with CSXT rules and procedures. Jacobs Dep. 117-20, 126, 128-29; Elliott Dep. 129-32. From a human resources perspective, Jacobs felt Plaintiff had difficulty communicating her thoughts. Jacobs Dep. 119. In addition, Elliott noted that English, who received the promotion, provided a better answer to an ethics question about the proper way to handle a fight between employees. Elliott Dep. 131-32. She was rated third out of the four candidates in the structured interview process. Jacobs Dep. 128–29. The candidate selected, Craig English, had a significant amount of experience, had gone through the management training program, had an MBA, a Six Sigma black belt, three years of military experience and a master's degree in industrial engineering. Jacobs Dep. 118.

Once Defendant produces a legitimate, nondiscriminatory reason for its employment decision, the burden returns to Plaintiff to present evidence sufficient to show that the reason given by Defendant is pretext for a discriminatory reason. Here, Plaintiff argues that she was better qualified than English and should have been awarded the RM job because she felt she did well on her interview. Pl. Dep. 224-26, 229. Plaintiff recorded[16] her interview and played it for Dick Spatafore, CSXT's Director of Program Construction at the time, who, Plaintiff testified, also thought she did very well on it. Pl. Dep. 224-26, 229. In his deposition, Spatafore testified that Plaintiff's interview was "above average," but he admitted that at least one of Plaintiff's answers to

---

[16]Plaintiff testified that she somehow did not retain a copy of this recording. Pl. Dep. 228.

a technical question was incorrect. Spatafore Dep. 163, 190 (Ex A to Def. Reply). In addition, Spatafore did not have the benefit of listening to recordings of the other three interviews for the position. Pl. Dep. 226-27; Spotafore Dep. 163, 190. McWhite also believed that Plaintiff was better qualified for the position than English. McWhite Decl. ¶ 9. Neither Plaintiff nor McWhite explain what made Plaintiff more qualified for the position than English. Nevertheless, Plaintiff's perception of her own experience, performance, and skills is not relevant. It is the perception of the decisionmaker that counts. See King v. Rumsfeld, 328 F.3d 145, 149 (4th Cir.2003); Hawkins v. PepsiCo, Inc., 203 F.3d 274, 280 (4th Cir.2000); Smith v. Flax, 618 F.2d 1062, 1067 (4th Cir.1980). "It is axiomatic that an employer is free to set its own performance standards, provided such standards are not a 'mask' for discrimination." Beall v. Abbott Labs., 130 F.3d 614, 619 (4th Cir.1997). Plaintiff has failed to present any evidence that the standards by which Defendant chose to measure the candidates for the Dillon RM position were a mask for discrimination. Thus, Plaintiff's claim fails as to this promotion.

With respect to the February 2013 RM position in Florence, Elliott testified that, based upon Plaintiff's performance in the December 2012 interview discussed above, as well as a March 2012 interview[17] (not at issue here), Defendant knew that Plaintiff was not prepared to be an RM. Elliott Dep. 160; see also Jacobs 126. Thus, when the Florence RM position opened two months later, in February 2013, Elliott directly placed Jonathan Thomas into the position. Jacobs Dep. 126.[18] Elliott

---

[17]In March 2012, Plaintiff interviewed for an RM position in Lumberton, North Carolina, and she received the lowest rating of the four candidatess. Jacobs Dep. 113; Jacobs Dec. ¶ 10. Her answers to technical questions reflected a lack of knowledge regarding applicable rules and procedures. Jacobs Dep. 113.

[18]Jacobs and Elliott also testified that Thomas was more qualified even though he had less time with the company, although Defendant does not argue that this was the main reason for their decision to hire him over Plaintiff. Jacobs Dep. 126; Elliott Dep. 152. Rather, as stated above,

stated that Thomas had done well filling in for an RM in Hamlet, North Carolina, which is a busy hump yard, and had done well in the position. Elliott Dep. 153. He also had experience with cars, track, and moot cars outside of his time with CSXT. Elliott Dep. 153.

Plaintiff argues that she was more qualified than Thomas for the position because Thomas was an external hire with no prior railroad experience before being placed on this job, he had been an ARM/RMIT for less time than the Plaintiff at the time of his placement into his job, and, after Thomas was hired for the position, she successfully covered the position for Thomas when he was out on leave. Pl. Dep. 231-32. McWhite also stated he felt Plaintiff was better qualified than Thomas. McWhite Decl. ¶ 9. Nevertheless, as stated above, it is the opinion of the decisionmaker that matters. Further, absent any policy by the employer, they are not required to promote according to or even consider seniority, Hux v. City of Newport News, Va., 451 F.3d 311, 316 (4th Cir. 2006); EEOC v. Federal Reserve Bank of Richmond, 698 F.2d 633, 670 (4th Cir. ) (where employer did not use seniority as a factor for promotion, plaintiff's seniority over the successful applicant was "of no moment"), rev'd on unrelated grounds sub nom, Cooper v. Federal Reserve Bank of Richmond, 464 U.S. 932 (1984). Finally, Plaintiff has not addressed the reason given by Defendant for not selecting her for the position, that is, her poor performance in her prior two interviews. Therefore, Plaintiff has failed to show pretext as to this position as well.

Finally, as to the February (or November) 2013 opening for an RM in Roanoke Rapids, North Carolina, which was awarded to Jonathan Turner, Defendant again asserts that Turner was more qualified for the position than Plaintiff. Elliott testified that Turner was better qualified because he either had an engineering degree or had worked towards one, they had originally hired him in the

---

they simply did not feel Plaintiff was ready to be a RM based upon her two, previous interviews.

bridge department and he had a lot of knowledge going through and designing track and bridges, and he showed promise as a RMIT. Elliott Dep. 154-55.[19]

Plaintiff argues that she was more qualified for the position because she had more experience as an ARM and RMIT than he did and had been on the Florence division longer than Turner, and she had come in as an internal trainee while Turner was an external hire with no prior railroad experience. Pl. Dep. 233. Plaintiff also argues that his engineering degree is irrelevant because most RMs do not have a college degree in engineering and having such a degree would not help an employee properly perform the duties of a RM any better. Pl. Dep. 233. McWhite also stated he felt Plaintiff was better qualified than Thomas. McWhite Decl. ¶ 9. Again, it is the opinion of the decisionmaker that matters, not Plaintiff's opinion or the opinion of other friends or coworkers, the employer is free to set its own performance standards, and an employer is not required to consider or give deference to seniority.

In sum, the ultimate burden of proving that Defendant intentionally discriminated against Plaintiff remains at all times with Plaintiff. She has the ultimate burden of presenting evidence from which a reasonable jury could conclude defendant intentionally discriminated against her. Plaintiff has failed to do so. Therefore, summary judgment is appropriate on Plaintiff's failure to promote claims.

### b.    Failure to Provide Training and Job Support

To establish a prima facie case of failure to provide training and job support, a plaintiff must show that: (1) the plaintiff is a member of a protected class; (2) the defendant provided training to its employees; (3) the plaintiff was eligible for the training; and (4) the plaintiff was not provided

---

[19]Jonathan Turner was also the son of John Turner, a former ADE, who had retired prior to his son's hire. Elliott Dep. 154.

training or job support under circumstances giving rise to an inference of discrimination. Thompson v. Potomac Elec. Power Co., 312 F.3d 645, 649-50 (4th Cir. 2002). Plaintiff does not point to any specific training that was offered to other employees but was not offered to her. Rather, she argues generally that she repeatedly sought to get "good training assignments out in the field," but she did not get any such opportunities until December fo 2013, when she was finally given the large system track surfacing and rail installation. Pl. Resp. 26. She argues that she was given undesirable training assignments, and speculates that the DEs went out of their way to be sure that all the good training assignments went to men. Pl. Resp. 28. However, she offers no evidence to support this assertion.

In contrast, Defendant notes two instances when Plaintiff complained about or declined the training opportunities she was given. It is undisputed that Plaintiff was assigned to the Hamlet yard, which she admits "was a very busy hump yard and would normally have been good training for an aspiring RM." Pl. Resp. 8. Although she complained that the assignment was not good for her because she had already worked in a hump yard in Selkirk, New York, that was an office job, not a field job, and she had not worked in the field in a hump yard. Pl. Dep. 50. Additionally, Plaintiff stated that in December 2013, CSXT assigned her to a very important large track system surfacing and rail installation, "the type of project that the Plaintiff had always hoped she would be assigned." Pl. Resp. 11. Instead of taking the project, however, she took vacation because she was going to lose the hours if she did not. She admits that other managers have chosen to forgo vacation in similar circumstances. Pl. Dep. 201–02.

Plaintiff fails to present sufficient evidence to show that she was denied training opportunities or job support under circumstances giving rise to an inference of discrimination. Accordingly, this claim fails as well.

C.      **Hostile Work Environment**

In her complaint, Plaintiff alleges that she suffered harassment in a hostile work environment based upon her sex.  To establish a prima facie case, Plaintiff must show that she suffered from harassment that was (1) unwelcome, (2) based on a protected status, (3) sufficiently severe or pervasive to alter the conditions of her employment and create an abusive atmosphere, and (4) imputable to the employer. E.E.O.C. v. C. Wholesalers, Inc., 573 F.3d 167, 175 (4th Cir. 2009). She must show that "but for" her gender, she would not have been the victim of the alleged discrimination. Causey v. Balog, 162 F.3d 795, 801 (4th Cir. 1998).

Defendant argues that Plaintiff cannot establish a prima facie case of a hostile work environment, in part, because she fails to show that the conduct was sufficiently severe or pervasive or that is was based upon her gender.

Plaintiff does not specifically identify in her response the conduct she claims gave rise to a hostile work environment.  In her complaint, she alleges the following:

• She has been exposed to gender harassing statements, jokes, graffiti, and paraphernalia, including having to work with and around a male employee, Ken Bass, who verbally harassed and threatened her (Compl. ¶ 8);

• She was not spoken to at meetings (Compl. ¶ 14);

• She was ostracized (Compl. ¶ 14);

• She was made uncomfortable (Compl. ¶ 14);

• She was told what to do by lower-level third parties (Compl. ¶ 14);

• She was told that she had to ride the Sperry Rail Test car every day and no provisions were made for her to go to the restroom (Compl. ¶ 18);

• She was sent to locations far away from her home (Compl. ¶ 20);

- She was not assigned a hi-rail truck quickly enough (Compl. ¶ 21);

- She was given fewer training opportunities (Compl. ¶ 22); and

- She was sent to work in a location with disciplinary problems (Compl. ¶ 23).

Most of these instances are discussed above in the facts section. However, Plaintiff has not provided any evidentiary support for her allegation that she was exposed to gender harassing statements, jokes, graffiti, and paraphernalia. "Title VII does not prohibit all verbal or physical harassment in the workplace; it is directed only at 'discriminat [ion] ... because of ... sex.'" Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 80 (1998). Although she does present testimony from other employees that they heard either Turner or Beverly refer to Plaintiff as a "bitch" on more than one occasion, Plaintiff has not testified that she heard anyone refer to her or anyone else as a "bitch" or that she even knew about their comments while she was working at CSXT. Plaintiff argues that "the critical inquiry is whether the plaintiff's environment was hostile ... 'because of' her sex" and not solely on whether the conduct was directed at the plaintiff. Harris v. Mayor and City Council of Baltimore, 429 Fed.Appx. 195, 200 (4th Cir. 2011) (citing Hoyle v. Frieghtliner, LLC, 650 F.3d 321, 326 (4th Cir. 2011). The facts in Harris reveal a clear, sexually hostile environment. There, the plaintiff was "repeatedly subjected to profane, sexually explicit language. . . . [She] overheard male employees refer to other women as "bitches" on a daily basis." Id. at 198. Male employees referred to women as "bitches" and "troublemakers" who "didn't belong in those jobs," and "the use of such language increased when females came into earshot." Id. The court noted that the plaintiff "could not have avoided overhearing" conversations between male employees discussing various sexual activities and discussions of "women's anatomy in a sexual manner." Id. "[L]anguage of this nature was used daily in the shop." Id. "In addition to profane language and conversations sexualizing women, a number of 'provocative[ ] pictures of women' were displayed

in the shops. The pictures featured women who were 'scantily clad,' wearing bathing suits, or simply 'naked.'" Id. (internal citations omitted).  The Fourth Circuit found that this conduct, which occurred in the presence of the plaintiff on a daily basis, was sufficient to satisfy the "because of sex" requirement for a hostile work environment claim, even though much of the conduct was not directed at the plaintiff.  Id. at 200.  Likewise, the cases cited in Harris all involved conduct that occurred in the presence of the Plaintiff.  See Hoyle, 650 F.3d at 326; Ocheltree v. Scollon Prods., Inc., 335 F.3d 325, 332 (4th Cir.2003); Petrosino v. Bell Atl., 385 F.3d 210, 222 (2d Cir.2004); see also Oladokun v. Grafton Sch., Inc., 182 F. Supp. 2d 483, 494 (D. Md. 2002) (finding that statements made outside the presence of the plaintiff could not support her hostile work environment claim when she was unaware of the statements).

Although Plaintiff attempts to analogize her environment with the hostile work environment at issue in Harris, she has failed to present facts sufficient to make such a comparison.  She has not produced evidence of sexually offensive or explicit language used in her presence, much less on a daily basis, or evidence of sexually offensive or explicit pictures displayed in her work environment.  Thus, her reliance on Harris is misplaced.

Throughout her response, Plaintiff also relies on the fact that she was the only female ARM/RMIT and the Florence Division had never had a female RM.  However, this fact alone is not sufficient to establish that any harassment Plaintiff suffered was because of her sex.  When addressing another protected class, race, the Fourth Circuit has held that "a dearth of African-American employees, without evidence as to the number of qualified African-Americans in the 'relevant labor pool,' does not establish even a circumstantial 'prima facie case of discrimination,' let alone direct or indirect evidence of purposeful discrimination." Diamond v. Bea Maurer, Inc., 128 Fed.Appx. 968, 971 (4th Cir. 2005) (citing Carter v. Ball, 33 F.3d 450, 456 (4th

Cir.1994)); see also Clark v. Western Tidewater Regional Jail Authority, No. 2:11-cv-228, 2012 WL 1633433, *10 (E.D.Va. 2012) (holding that fact that 90% of employees were of the opposite race was insufficient to establish that any race-neutral harassment was actually based on race); Ruffin v. Lockheed Martin Corp., 126 F. Supp. 3d 521, 530 (D. Md. 2015) ("[Plaintiff's] status as the only African-American in her group does not permit a plausible inference that the unwelcome conduct described above was based on her race."). Therefore, the fact that Plaintiff was the only female ARM/RMIT is insufficient alone to show that any harassment she perceived was based upon her sex.

In addition, Plaintiff fails to present sufficient evidence of harassment that was severe or pervasive. "Element three of a hostile work environment claim [sufficiently severe or pervasive] requires a showing that 'the environment would reasonably be perceived, and is perceived, as hostile or abusive.'" Boyer-Liberto v. Fontainebleau Corp., 786 F.3d 264, 277 (4th Cir. 2015) (citing Harris v. Forklift Systems. Inc., 510 U.S. 17, 22 (1993)). The Fourth Circuit has established a four factor approach to evaluate the totality of the circumstances in determining whether conduct is severe or pervasive: (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it was physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interfered with plaintiff's work performance. Connor v. Schrader Bridgeport Int'l, Inc., 227 F.3d 179, 193 (4th Cir.2000). The Fourth Circuit has "recognized that plaintiffs must clear a high bar in order to satisfy the severe or pervasive test." Sunbelt Rentals, Inc., 521 F.3d at 315.

The conduct about which Plaintiff complains, she was not spoken to at meetings, ostracized, made uncomfortable, told what to do by lower-level third parties, told that she had to ride the Sperry Rail Test car every day and no provisions were made for her to go to the restroom, sent to locations far away from her home, not assigned a hi-rail truck quickly enough, given fewer training opportunities, and sent to work in a location with disciplinary problems are all, for the most part,

simply complaints about her job assignments.  "[A]ssigning individuals to difficult jobs are not objectively abusive actions, particularly considering that we 'do[ ] not sit as a kind of super-personnel department weighing the prudence of employment decisions made by [employers] charged with employment discrimination.'" Combs-Burge v. Rumsfeld, 170 Fed.Appx. 856, 862 (4th Cir. 2006)  (citing DeJarnette v. Corning Inc., 133 F.3d 293, 299 (4th Cir.1998)).  Plaintiff's disagreement with her supervisors' decisions and management style cannot support a hostile work environment claim.  See Thorn v. Sebelius, 766 F.Supp. 585, 601 (D.Md. 2011) (holding that plaintiff failed to establish a claim of a hostile work environment where the cited instances of alleged harassment "amount[ed] to instances where [plaintiff] disagreed with the management style or decisions of those who supervised him—and that alone is not actionable under Title VII"), aff'd, 465 Fed. Appx. 274 (4th Cir.2012); Hemphill v. ARAMARK Corp., No. 1:12-CV-01584-ELH, 2014 WL 1248296, at *14 (D. Md. Mar. 25, 2014), aff'd, 582 F. App'x 151 (4th Cir. 2014) (noting that grievances as to a supervisor's management style cannot support a hostile work environment claim).

In addition, although Plaintiff complains that she was not spoken to at meetings, was ostracized, and made to feel uncomfortable,  general complaints of rude treatment are not sufficient to sustain a hostile work environment claim. See Baqir v. Principi, 434 F.3d 733, 747 (4th Cir.2006) (stating that rude treatment by supervisors is "conduct falling short of that required to sustain a hostile work environment claim"). "[C]omplaints premised on nothing more than rude treatment by coworkers, callous behavior by one's superiors, or a routine difference of opinion and personality conflict with one's supervisor are not actionable under Title VII." E.E. O.C. v. Sunbelt Rentals, Inc., 521 F.3d 306, 315-16 (4th Cir.2008)).

Title VII is not a "general civility code." Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 80, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998). "Workplaces are not always harmonious

locales, and even incidents that would objectively give rise to bruised or wounded feelings will not on that account satisfy the severe and pervasive standard." Sunbelt Rentals, Inc., 521 F.3d at 315. The evidence presented by Plaintiff in this action is insufficient to give rise to a hostile work environment claim, and, therefore, summary judgment is appropriate.

### D.    Constructive Discharge

Plaintiff alleges that CSXT constructively discharged her by placing her on unpaid leave and denying her the opportunity to fill open positions. Compl. ¶ 39. To prove constructive discharge, Plaintiff must show that CSXT deliberately made her working conditions intolerable in order to make her quit.[20] Munday v. Waste Mgmt. of N. Am., Inc., 126 F.3d 239, 244 (4th Cir. 1997). She must prove two elements: (1) the "deliberateness of [CSXT's] actions;" and (2) the "intolerability of the working conditions." Martin v. Cavalier Hotel Corp., 48 F.3d 1343, 13554 (4th Cir. 1995).

For the reasons discussed above with respect to Plaintiff's hostile work environment claim, Plaintiff's constructive discharge claim fails because she is unable to meet the "intolerability of the working conditions" prong.  " The 'severe and pervasive' standard required to state a hostile work environment claim is lower than the 'intolerability' standard required for a constructive discharge claim.  Tawwaab v. Virginia Linen Service, Inc., 729 F.Supp.2d 757, 783 (D.Md. 2010) (citing Tutman v. WBBM–TV, Inc./CBS, Inc., 209 F.3d 1044, 1050 (7th Cir.2000) ("[W]orking conditions for constructive discharge must be even more egregious than the high standard for hostile work environment."); Spencer v. Wal–Mart Stores, Inc., 469 F.3d 311, 317 (3d Cir.2006) ("To prove constructive discharge, the plaintiff must demonstrate a greater severity of pervasiveness of harassment than the minimum required to prove a hostile work environment."); Griffin v.

---

[20]As an initial matter, Defendant notes that Plaintiff never quit her position as CSXT.  She took medical leave in January of 2014, and was terminated in December 2015.

Delchamps, Inc., 176 F.3d 480 (5th Cir.1999) (same)).  Thus, because Plaintiff has failed to present sufficient evidence to satisfy the severe or pervasive standard applicable in her hostile work environment claim, it follows that she cannot meet the higher intolerability standard necessary to support her constructive discharge cause of action.  Accordingly, summary judgment is appropriate.

### E.    Retaliation

Finally, Plaintiff alleges she was retaliated against after testifying "on behalf of another employee, Ernest McWhite, in a race discrimination lawsuit against Defendant." Compl. ¶ 12.[21] Title VII prohibits retaliation against an employee because the employee "opposed any practice made an unlawful employment practice by [Title VII], or because [the employee] has . . . participated in any manner in an investigation" under Title VII. 42 U.S.C. § 2000e-3(a).  To establish a prima facie case of retaliation under Title VII, a plaintiff must show (1) he engaged in protected activity, (2) the employer took adverse employment action against him, and (3) a causal connection existed between the protected activity and the adverse action. Ross v. Communications Satellite Corp., 759 F.2d 355, 365 (4th Cir.1985); Laughlin v. Metropolitan Washington Airports Authority, 149 F.3d 253, 258 (4th Cir.1998); Causey v. Balog, 162 F.3d 795, 803 (4th Cir.1998). If Plaintiff establishes a prima facie case, Defendant can rebut the presumption of retaliation by articulating a non-retaliatory reason for its actions. At that point, Plaintiff has the opportunity to prove that Defendant's legitimate, non-retaliatory reason is pretextual. See Matvia v. Bald Head Island Management, 259 F.3d 261, 271 (4th Cir.2001).

Plaintiff indeed engaged in protected activity when she was deposed on August 11, 2011, in

---

[21]In her complaint, she also alleges that she was retaliated against after she "spoke to a supervisor regarding her not being treated in the same manner as her male coworkers."  Compl. ¶ 13.  However, she does not address this allegation in her response, and, thus, it appears she has abandoned this claim.

support of Darryl Brown's and Ernest McWhite's race discrimination claims against CSXT.  See Glover v. South Carolina Law Enforcement Division, 170 F.3d 411, 413 (4th Cir. 1999).

Plaintiff argues that she suffered adverse employment actions when she was not given "good and proper support and training and was denied numerous promotions to RM."  Pl. Resp. 35. Defendant argues that, although Plaintiff did suffer adverse employment actions when she was denied promotions, a lack of good and proper support and training does not rise to the level of an adverse employment action.  The Supreme Court has clarified that a different and less strenuous standard is used to define adverse employment actions in the retaliation context as opposed to other Title VII contexts: "[T]he anti-retaliation provision, unlike the substantive provision, is not limited to discriminatory actions that affect the terms and conditions of employment." Burlington Northern & Santa Fe Rwy. v. White, 548 U.S. 53, 64, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006). However, the anti-retaliation provision "protects an individual not from all retaliation, but from retaliation that produces an injury or harm." Id. at 67. Thus, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Id. at 68 (quotation marks and citations omitted).

As discussed above with respect to Plaintiff's discrimination claims, Plaintiff fails to point to and specific instances when she was denied training.   She argues generally that she repeatedly sought to get "good training assignments out in the field,"  but she did not get any such opportunities until December fo 2013, when she was finally given the large system track surfacing and rail installation. Pl. Resp. 26.  She argues that she was given undesirable training assignments, and speculates that the DEs went out of their way to be sure that all the good training assignments went to men. Pl. Resp. 28.  However, she offers no evidence to support this assertion.  Thus, she fails to

-37-

present sufficient evidence to create a genuine dispute of fact for trial.

As to the promotions denials, Plaintiff fails to address the causal connection requirement in her response. Nevertheless, the record reveals that no causal connection exists between the promotions denials and her deposition testimony in August of 2011. "[A] causal connection for purposes of demonstrating a prima facie case exists where the employer takes adverse employment action against an employee shortly after learning of the protected activity." Price v. Thompson, 380 F.3d 209, 213 (4th Cir.2004). However, the temporal nexus between two events cannot provide proof of causation unless the "temporal proximity between an employer's knowledge of protected activity and an adverse employment action" was "very close." Clark County School District. v. Breeden, 532 U.S. 268, 273, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001) (internal quotation marks omitted). Here, the protected activity occurred in August of 2011. Any promotion denials that occurred prior to October 5, 2012, are outside the limitations period. The first promotion denial within the limitations period was in December of 2012. "Clark does not establish the outer boundaries for temporal proximity to be considered 'very close,' but it does cite examples of insufficient temporal proximity–evidence that the employer took the adverse action three or four months after the protected activity cannot alone establish causation." Shields v. Fed. Exp. Corp., 120 F. App'x 956, 963 (4th Cir. 2005) (citing Clark, 532 U.S. at 273-74). Even if the court considered the denials outside the limitations period, the first one occurred in December of 2011, and, thus, would still have been too tenuous to alone create a causal connection. Accordingly, Plaintiff cannot establish a prima facie case of retaliation, and summary judgment is appropriate.

## V.    CONCLUSION

While the record in this case reveals that Plaintiff and her coworkers and supervisors did not get along, she fails to present sufficient evidence to establish any violations of Tile VII or § 1981.

Therefore, it is recommended that Defendants' Motion for Summary Judgment (Document # 35) be granted and this case dismissed in its entirety.

s/Thomas E. Rogers, III

Thomas E. Rogers, III
United States Magistrate Judge

August 4, 2016
Florence, South Carolina